DRAKE, J.
Un this dispute concerning the scope and payment for work performed constructing, a chemical processing plant, Cajun Constructors, Inc. (Cajun) appeals a motion for summary judgment granted in favor of Syngenta Crop Protection, Inc. (Syngenta), dismissing Cajun’s claims against Syngenta, with prejudice. Cajun also seeks review of the trial court’s interlocutory ruling denying its motion for partial summary judgment. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY

This case involves a state law contract dispute between two Louisiana companies and a lien filed pursuant to the Louisiana Private Works Act (LPWA). See La. R.S. 9:4801 et seq. Syngenta owns and operates a large industrial plant in St. Gabriel, Louisiana in Iberville Parish (Syngenta plant), that synthesizes and formulates certain compounds used in products for agricultural use. One of the byproducts of operations at the Syngenta plant is hydrochloric acid. Around 2003, Syngenta was approached by individuals from Texas who asserted they-could convert the hydrochloric acid by-product. Syngenta produced at its plant into marketable liquid calcium chloride' (CaCl2). These individuals eventually formed an entity called EcoProduct.[1]
Subsequently, Syngénta and EcoProduct entered into a lengthy, detailed agreement dated September 29, 2004. The agreement granted to EcoProduct a lease of approximately five acres of immovable property within the Syngenta plant for the construction of a CaCl2‘ conversion facility (CaCl2 facility). The 2004 agreement between Syrigenta and EcoProduct stated that the CaCL facility would be “engineered, designed, constructed!,] ánd owned by EcoProduct' on Syngenta | ^property leased to EcoProduct.” During Phase I of the agreement, EcoProduct would construct' the' CaCl2 facility; during Phase II, EcoProduct would complete the start-up of the CaCl2 facility; and during Phase III, the CaCl2 facility would be fully operational and commercial.
EcoProduct issued a request to Cajun to bid on the project to build the CaCl2 facility. Ón June 30, 2005, EcoProduct issued three separate purchase orders to Cajun to perform the (i) site preparation work; (ii) fabrication and erection of structural steel; and (iii) mechanical construction services required for the construction of the CaCl2 *152 facility. The bid proposal and other documents pertinent to the construction of the facility.identified EcoProduct as “owner” and Cajun as “contractor.” EcoProduct is not a licensed contractor in the State of Louisiana.[2]
Construction of the facility, Phase I, was completed by December 2005. Cajun submitted . invoices for payment to EcoPro-duct, identifying EcoProduct as owner. Cajun was paid by EcoProduct for the work it had performed pursuant.to the June 30, 2005 purchase orders, less a re-tainage amount for the mechanical construction services, which was disputed by EcoProduct.
Following the completion of construction of the CaCl2 facility, EcoProduct asked Cajun to assist with the stai’t-up of the facility, Phase II. EcoProduct agreed that Cajun would be paid on a time .and material basis for the start-up work it performed. Cajun subsequently performed start-up related work on the CaCl2 facility, but contended that EcoProduct failed to pay all of the invoices submitted for the start-up work, Specifically, Cajun contends Eco-Product failed to pay fourteen of twenty-eight invoices submitted for the start-up work. In total, Cajun claimed ⅜ was owed approximately $1.5 million for the June 30, 2005 purchase order retainage and for its performance of start-up work on the CaCl2 facility.
|4On August 8, 2006, Cajun timely recorded a statement of claim and privilege against- Syngenta’s property for the sums allegedly owed to Cajun for woi’k it performed on the CaCl2 facility.
On October 13, 2006, Cajun filed a petition to enforce lien. and for damages against EcoProduct, Syngenta, and numerous other parties[3] in the Eighteenth, Judicial District Court for the State of Louisiana. On November 22, 2006, Cajun filed an amended statement of claim and privilege, increasing its-claim to $1,547,152.08. Cajun also sought damages for breach of contract, fraudulent inducement, negligent misrepresentation, unjust enrichment, as well as costs and attorneys’ fees. EcoPro-duct removed the case to the United States District Court for the Middle District of Louisiana on the basis of diversity jurisdiction; however, the case was remanded to state court in May 2007.
By written correspondence dated October 16, 2007, Syngenta terminated the September 29, 2004 agreement with Eco-Product for numerous breaches, including the fact that the Ca^ facility was not fully operational and commercial. Syn-genta demanded that EcoProduct begin the process of removing the CaCl2 facility from the. Syngenta plant. When EcoPro-duct failed to remove its CaCl2 facility, Syngenta noticed EcoProduct, via written correspondence dated April 3, 2008, that Syngenta was taking ownership of Eeo-Product’s CaCl2 facility.
Syngenta filed a motion for summary judgment in February 2009, addressing all of Cajun’s claims. The trial court denied Syngenta’s motion without prejudice so as to afford the parties opportunity for further discovery. . . ■
Cajun filed its first supplemental, amended, and restated petition to enforce lien and for damages, on July 23, 2009, adding claims for recovery based on intentional interference with contractual relations, single- business entity doctrine,-Land *153 a joint-venture theory.[4] Cajun subsequently filed its second supplemental, amended, and restated petition to enforce lien and for damages on October 19, 2009, adding a claim for attorneys’ fees and costs pursuant to the open .account, statute.[5] .
On August 2, 2010, EcoProduct filed a voluntary petition for bankruptcy in the United States Bankruptcy Court .for the Southern District of Texas.[6] See Í,1 U.S.C. § 101 et seq. Based on EcoProduct’s bankruptcy filing, on November 12, 2010, Syngenta removed the case to the United States District Court for the Middle District of Louisiana, stating in its notice of removal that Syngenta intended to transfer the instant case to the bankruptcy proceeding in Texas.[7]
Following a motion for modification of the automatic stay filed by Cajun,, the Texas bankruptcy court entered an order on April 8, 2011, permitting Cajun to resume litigation against Syngenta in the United States District Court for the’ Middle District of Louisiana. Syngenta had also requested a modification of the stay, requesting that it be permitted to initiate litigation addressing the ownership and the validity and ranking of encumbrances on the CaCl2 facility.
Cajun then filed a motion'to transfer venue to the Texas bankruptcy court. Syngenta . subsequently dismissed - its claims against EcoProduct’s bankruptcy estate and opposed the transfer of the case. The United States District Court for |fithe Middle .District of Louisiana remanded the case to state court on August 13, 2012.[8]
Syngenta filed a motion for partial summary judgment on April 25, 2013, seeking dismissal of Cajun’s joint venture'claims. Then, on May 8, 2013, Cajun and the Eco-Product bankruptcy trustee filed a joint motion to dismiss, without prejudice: (i) Cajun’s claims against the EcoProduct bankruptcy-trustee; and (ii) Cajun’s claims against EcoProduct Solutions, GP,' L.L.C. These parties agreed that any claims remaining between them would bé submitted through the Texas bankruptcy court. Then, on June 3, 2013, Cajun, the EcoPro-duct' bankruptcy trustee, and the Rogers parties filed á' motion to dismiss the claims among them, with prejudice. Syngenta opposed both motions. The trial court ultimately granted the June 3, 2013 motion, dismissing with prejudice the claims among the Rogers parties, Cajun, and the EcoProduct bankruptcy trustee. Thereafter, Cajun also filed a motion for leave to file its third supplemental, amended, and restated petition to enforce lien and damages on July 9, 2013.[9]
*154 On October 10, 2013, Cajun filed a motion for partial summary judgment on its LPWA claim against Syngenta. Cajun also filed, on October 30, 2013, a revised motion for leave to file its third amended petition. Syngenta opposed both motions, which were set for hearing on December 5, 2013.
Prior to the December 5, 2013 hearing, Cajun and Syngenta agreed to certain stipulations, which were placed on the record at the hearing. Cajun and Syngenta stipulated to a dismissal, without prejudice, of all claims as to all parties, except for Cajun’s LPWA claim against Syngenta. Cajun reserved its right to pursue any claim it may have had against the EcoProduct bankruptcy estate trustee or any |7othei-party. Syngenta withdrew its motion for partial summary judgment (filed April 25, 2013) as moot. The trial court denied Cajun’s motion for partial summary judgment (filed October 10, 2013), but granted its motion to file its third supplemental, amended, and restated petition to enforce lien and for damages, wherein Cajun asserted its LPWA claim against Syngenta. Following the hearing, the trial court rendered judgment on February 11, 2014.
Syngenta subsequently moved for summary judgment on February 13, 2014, on the basis that pursuant to the LWPA, specifically La. R.S. 9:4802 and 9:4806, Syngenta could not be liable to Cajun for the construction expenses that EcoProduct allegedly failed to pay. Cajun opposed the motion. Following a hearing on April 3, 2014, the trial court granted summary judgment in favor of Syngenta, dismissing all of Cajun’s claims against Syngenta with prejudice. The trial court adopted the law and evidence presented by Syngenta in its motion for summary judgment, supporting memorandum, and reply to Cajun’s opposition. The trial court held that La. R.S. 9:4806 was the controlling law and that Syngenta and EcoProduct entered into a lease; that EcoProduct owned the CaCl2 facility; that EcoProduct contracted with Cajun for the construction of the CaCl2 facility; and that the lack of recordation did not override controlling law, i e., the LPWA. The trial court signed a judgment on April 17, 2014.
It is from the April 17, 2014 judgment that Cajun now appeals, seeking reversal of the summary judgment entered in Syn-genta’s favor. Cajun also asks this court to review the trial court’s February 11, 2014 denial of its motion for partial summary judgment. Cajun asks that this court render summary judgment in its favor in the full amount of its amended lien claim, or in the alternative, render judgment establishing Syngenta’s liability under the LPWA and remand the case to the trial court for further proceedings.

\ ASSIGNMENTS OF ERROR

Cajun assigns the following as errors on appeal:
1. The district court erred by misapplying language from La. R.S. 9:4806(B) concerning the work of a lessee that has no bearing on this case;
2. The district court erred by finding that EcoProduct was not a “contractor” as defined by La. R.S. 9:4807(A);
3. The district court erred by finding that Syngenta was not an “owner ... who ... contracted with the contractor” for purposes of La. R.S. 9:4806(B);
4. The district court erred by finding that an unrecorded agreement conferred ownership of a building or other construction to a person other than the owner of the ground from the perspective of Cajun, a third party to that agreement;
*155 5. The district court erred by finding that an unrecorded alleged lease was effective toward Cajun, a third party to that alleged lease; and
6. The district court erred by finding that Syngenta and EcoProduct entered into a lease.
Cajun also requests costs and attorney fees pursuant to La. R.S. 9:4822(L)(2). ■

STANDARD OF REVIEW

A motion for summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B)(2).
The burden of proof on a motion for summary judgment is on the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court 'on the motion, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim. Thereafter, if the adverse party fails to produce factual evidence sufficient to establish that he will be able to | nsatisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact, and the mover if entitled to summary judgment. La. C.C.P. art. 966(C)(2).
An appellate court’s review of a summary' judgment is de novo review based on the evidence presented to the trial court, using the same- criteria used by the court in deciding whether a summary judgment should be granted. Kessler Federal Credit Union v. Rivero, 2014-0095 (La.App. 1 Cir. 9/19/14), 153 So.3d 1218, 1221. Because it is the applicable substantive ’ law that determines materiality, whether a particular fact in dispute is “material” for summary judgment purposes can be seen only in light of the substantive law applicable to the ease. Shipp v. Landry, 2013-1673 (La.App. 1 Cir. 5/2/14), 147 So.3d 721, 725.
As noted, also before this court is Cajun’s motion for partial summary judgment, which was denied by the trial court on February 24, 2014. Generally, an appeal may not be taken from the trial court’s denial of a motion for summary judgment. See La. C.C.P. art. 968. However, it may be reviewed on an appeal of a final judgment in the suit. Gilchrist Const. Co., L.L.C. v. State Dept. of Transp. and Development, 2013-2101 (La.App. 1 Cir. 3/9/15), 166 So.3d 1045, 1051, writ denied, 2015-0877 (La.6/30/15), 172 So.3d 1097. When an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings, in addition to review of the final judgment. Landry v. Leonard J. Chabert Med. Ctr., 2002-1559 (La.App. 1 Cir. 5/14/03), 858 So.2d 454, 461 n. 4, writs denied, 2003-1748, 2003-1752 (La.10/17/03), 855 So.2d 761. Therefore, we also coftsider Cajun’s arguments that the trial court erroneously denied -its motion for partial summary judgment.
The substantive' issues involved herein fall under' the LPWA, as discussed below.
I uLAW AND DISCUSSION
The LPWA
The motion for summary judgment at issue here arose in the context of a suit under the LPWA, La. R.S. 9:4801 et seq., which provides a method for contractors and other persons to recover .the costs of labor and/or materials from a party with *156 whom there is no-contract. Simms Hardin Co., L.L.C. v. 3901 Ridgelake Drive, L.L.C., 2012-469 (La.App. 5 Cir. 5/16/13), 119 So.3d 58, 65, writ denied, 2013-1423 (La.9/27/13), 123 So.3d 726. A subcontractor has a claim against the owner of an immovable for the price of professional services rendered in connection with work that is undertaken by a contractor or subcontractor. La. R.S. 9:4802(A)(1). The claim against the owner shall be secured by a privilege on the immovable on which the work is performed. La. R.S. 9:4802(B). The claim against an owner under La. R.S. 9:4802 is limited to: (1) the owner(s) who have contracted with the contractor, or (2) to the owner(s) who have agreed in writihg to the price and work of the contract of a lessee. La. R.S. 9:4806(B). The privilege granted by La. R.S. 9:4802 affects only the interest in or on the immovable enjoyed by the owner whose obligation is secured by the privilege. La. R.S. 9:4806(C).[10]
, For purposes of the LPWA, an owner is defined as “[a]n owner, co-owner, naked owner, owner of a predial servitude, possessor, lessee, or other person owning or having the right to the use or enjoyment of an immovable or having an interest therein.” La. R.S. 9:4806(A).
In its first, second, and.third assignments of error, Cajun avers that Syngenta is the sole, unified -owner of the; land- as well as the CaCl2 facility constructed by EcoProduct. Cajun avers that as owner of the St. Gabriel plant, Syngenta entered into a written contract to build the CaCl2 facility with EcoProduct (the September
|n29, 2004 agreement); then EcoProduct, as general contractor, subcontracted work on the CaCl2 facility to Cajun, making Syngenta an “owner who contracted with a contractor,” pursuant to La. R.S. 9:4806(B).Under the LPWA, Cajun asserts it has the right to secure a privilege on the immovable, in the form of a lien against Syngenta’s property, for Cajun’s failure to be paid for work performed on the construction of the CaCl2 facility pursuant to its contract with • EcoProduct. Cajun argues that its claim for.- unpaid work against Syngenta, as owner, was properly secured by a privilege in the form of the lien filed on Syngenta’s immovable property. See La. R.S. 9:4802(A)(1) and .9:4802(R).
Syngenta argues that the September 29, 2004 agreement is a valid lease agreement, wherein Syngenta granted a leasehold interest in immovable property to EcoPro-duct under the terms and conditions set forth in the agreement. Syngenta argues that the agreement was not a contract to build and that EcoProduct was not Syn-genta’s “contractor” — the , agreement states that the facility will be “owned by EcoProduct on Syngenta property” leased by EcoProduct. Syngenta avers there was .no contract to build, no sum, and no scope of the work included in the agreement, nor did Syngenta have a light to specific performance for construction of the facility. Neither Syngenta nor EcoProduct filed a notice of contract and bond because as Syngenta argues, the parties never entered into a contract* to build.[11] Syngenta argues that in fact it terminated thé agreement and demanded EcoProduct remove *157 its Ca,Cl2 facility from Syngenta’s plant. Syngenta contends EcoProduct, was its lessee, and pursuant to La. R.S. 9:4806(B), EcoProduct could be a lessee-owner of the CaCl2 facility. Pursuant to La. R.S. 9:4806(B), Syngenta avers it was not an owner who contracted with a contractor, nor did Syngenta agree in writing to specifically be liable for any claims granted by the provisions of La. |12R.S. 9:4802. According to Syngenta, the LPWA does not impose personal liability on Syngenta, nor does any privilege attach to any of Syn-genta’s property.
Countering Syngenta’s arguments, in its fourth, fifth, and sixth assignments of error, Cajun alleges that Syngenta has attempted to mischaracterize its September 29, 2004 agreement with EcoProduct as a lease to avoid liability under the LPWA. Furthermore, Cajun argues that even' if the September 29, 2004 agreement could be interpreted as a valid lease agreement, neither Syngenta nor EcoProduct recorded the agreement in the Iberville Parish property records. Cajun avers that a section of the agreement expressly required recordation. Cajun also argues that recor-dation was required pursuant to the public records doctrine. Because the lease was not’Recorded, no evidence of 'EcoProduct’s separate ownership of the CaCl2 facility exists in the Iberville Parish property records, and furthermore, an unrecorded interest in1 immovable property cannot be asserted against third parties — in this case, Cajun. . ,
Syngenta responds) arguing- that the lack of recordation of the September 29, 2004 agreement does not create liability under the LPWA as to Syngenta for Cajun’s claims. Syngenta argues that La. R.S. 9:4806 contains no recordation requirement and that as special legislation in derogation of general law, the LPWA is controlling over the public records doctrine. Furthermore, Syngenta argues that the section of the September 29, 2004 agreement that Cajun alleges requires re-cordation is not controlling. Syngenta avers that section required. EcoProduct to perform certain acts, including recording the lease, upon completion of the start-phase of its CaCl2 facility. Thus, the re-cordation requirement did not even come into play until after the CáCl2 facility completed the start-up phase, ie., after Cajun’s work was completed.
We must therefore examine de novo the pleadings, depositions, answers to interrogatories, and admissions, together with any affidavits admitted for purposes |1sof Syngenta’s motion for summary judgment to determine whether Syngenta met its burden of proof that there is no genuine issue of material fact that ■ Syngenta was not the owner of the EcoProduct CaCl2 facility.' See La. C.C.P. art. 966(B)(2) and (C)(2).
Syngenta filed' its motion for summary judgment! (R. 6.1167), a list of essential legal elements and statement of uncontested material facts (R. 6.1173), and its memorandum. (R. 5:1173). In support of its motion for summary judgment, Syngenta submitted:
(A) (i) Syngenta’s responses to Cajun’s interrogatories and request for production no. 1, and (ii) the September 29, 2004 agreement between Syn-genta and EcoProduct;
(B) (i) Deposition of Cajun by Thomas "Hutchinson taken October 10, 2008, and particular- exhibits attached ■ thereto: (ii) Exhibit 2, the purchase . orders, (iii) Exhibit 4, the EcoPro-duct request for bid, and (iv) Exhibit 5, Cajun’s response to EcoProduct , .inquiry;
(C) EcoProduct’s responses to Syngen-ta’s -first requests for admissions;
*158 (D) Cajun’s status report filed in the U.S. District Court for the Middle District of Louisiana;
(E) Cajun’s statement of claim and privilege and recordation in the Iber-ville Parish records;
(F) Transcript of the December 5, 2013 hearing on Cajun’s motion for summary judgment (filed October 10, 2013);
(G) February 11, 2014 judgment of the trial court, denying Cajun’s motion for summary judgment;
(H) Deposition of EcoProduct Solutions GP, L.L.C. by W. Yandell Rogers, III;
(I) Deposition of EcoProduct Solutions, LP by Matthew Rogers; . ■
(J) (i) Deposition of Cajun representative, Michael T. Largey, project manager of the CaCl2 facility, and particular exhibits attached thereto: (ii) Exhibit 3, Cajun invoice, and (iii) copy of EcoProduct check no. 11879 paid to Cajun in the amount of $21,198.28;
(K) Affidavit of Ralph Caddell, Syngen-ta representative; and
(L) Demand letters from Syngenta to EcoProduct: (i) July 3, 2007 demand letter, (ii). October 16, 2007 demand letter, and (iii) April 3, 2008 demand letter.
Cajun opposed' Syngenta’s motion for summary judgment and also filed a list of genuinely disputed material facts.. In support of its opposition, Cajun submitted:
| U(A) the September 29, 2004 agreement between Syngenta and EcoPro-duct;
(B)(i) E coProduct’s responses and objection to Syngenta’s first requests for admission and interrogatories, (ii) Affidavit of Drew C. Gaudet, and (iii) Act of Contribution of Immovable Property;
(C) Affidavit of Tommy Hutchinson dated March 25, 2014;
(D) Deposition of Syngenta by Murry McMillan;
(E) Deposition of Robert Slaven;
(F) Minutes of a July 2,1985 meeting of the Louisiana State Legislature Senate Committee on Judiciary A;
(G) Copy of House Bill No. 1779 of the 1985 Regular Session of the Louisiana State Legislature; and
(H) Copy of House Bill No. 1779 of the 1985 Regular Session of the Louisiana State Legislature.
Syngenta filed a reply to Cajun’s opposition.
Syngenta acknowledged that it is. engaged principally in the development, manufacture, and marketing of a wide variety of crop protection products including herbicides, fungicides,.and insecticides. Syn-genta also offers professional products utilized on grass and plants in parks, golf courses, and public lands. The Syngenta plant located in St. Gabriel manufactures and formulates certain crop protection products. The plant also manufactures raw materials utilized in the production of crop protection products.
The September 29, 2004 agreement between. Syngenta and EcoProduct recites, in pertinent part:
Whereas, Syngenta owns and operates a chemical manufacturing plant located at 3905 Hwy 75 in St. Gabriel, Louisiana ... at which, as a byproduct of Syngen-ta’s manufacturing process, hydrochloric acid is produced.
Whereas, EcoProduct has the manufacturing and marketing expertise to neutralize the hydrochloric acide with lime and apply evaporation technology to pro *159 duce 38% liquid calcium chloride for commercial use.
Whereas, manufacture of the marketable calcium chloride from the hydrochloric acid will be accomplished by Eco-Product at a calcium chloride plant to be located on the property of the Syngenta Plant ... .
Whereas, the CaCl2 Plant will be engineered, designed, constructed!],] and owned by EcoProduct on Syngenta property leased by EcoProduct and EcoProduct shall pay Syngenta for its 1^contract services to operate and maintain the plant on behalf of EcoProduct. (Emphasis added.)
According to Section 7.0, the term of the agreement commenced on September 29, 2004 and would continue through the three phases of the agreement. During Phase I, EcoProduct would “complete the design, engineering, procurement, construction, installation!],] and commissioning of the Eco-Product Facilities.” During Phase II, Ec-oProduct would complete the start-up of the CaCl2 facility. During Phase III, the CaCE facility would be fully operational and commercial.
Section 2.2 of the agreement provides that “Syngenta shall grant to EcoProduct a leasehold interest in. and to a parcel of real property measuring approximately five acres in area .., being a portion of Block F-7 at the Syngenta Plant site.” Section 2.2(b) provides that “[t]he term of the CaCl2 Plant Site lease shall run concurrently with the term of - [the] Agreement.” Section 2.2(c) of the agreement states that “EcoProduct shall pay to Syn-genta Annual lease rent and use fees totaling $10,000.00 for the use of Syngenta’s property and facilities ... ”. Section 2.2(d) grants EcoProduct reasonable rights of use and ingress and egress to the CaCl2 Plant Site, among other areas. Section 2.6 provides: ' .
Upon completion of Phase II, a metes and bounds survey of all leasehold interests), easement(s)[,] and right(s) of way ... shall be prepared by EcoProduct, at its expense, and recordable memo-randa of the leasehold interest, all easements, all licenses and all rights of way, or the equivalent thereof .,, shall be prepared, executed[,] and recorded with the Parish of Iberville. (Emphasis added.) ■
Pursuant to Section 3.2 of the agreement, EcoProduct was responsible for “all supervision, design, engineering and procedure services, consultations, construction and other required services,- equipment and materials, labor, construction-tools and supplies, temporary structures, and transportation ... ”. EcoProduct would also “be responsible for the safety related to, and during, the |16design, engineering[,] and construction of EcoProduct Facilities to protect workers, the public and all other people, Syngenta’s other property[,] and the property of third parties.” • Furthermore, Section 3.2(e) of the agreement provides:
EcoProduct shall cause its contractors, subcontractors[,] . or vendors that provide services during - Phase I to sign ■ affidavits of payment and release and waivers of liens at the completion of services rendered in connection with the construction of the EcoProduct Facilities. EcoProduct shall defend and indemnify Syngenta against any loss or damage, arising from any claims related to the enforcement of-any such liens.
Section 5.2 states that “EcoProduct shall be responsible, at its expense, for all Capí-, tal Expenditures for the EcoProduct Facilities.” EcoProduct was also responsible to pay “all sales, exoise [sic]; ad valorem, property, franchise, occupational and disposal taxes, or other taxes associated with the ownership, operation, maintenance^] *160 or repair of .the EcoProduct Facilities.” Syngenta agreed to provide at its own expense “management, supervisory,, technical,] and labor personnel necessary for the operation and maintenance of EcoPro-duct Facilities.” Syngenta would “operate, maintain[,] and/or monitor the EcoProduct Facilities on a 24-hour per day, seven-day per week schedule.” However, Syngenta’s services did not include “Capital Expenditures, utilities, extraordinary process control, parts, inventory!,] and [certain described] supplies.”
, Section 8,0 of the agreement states that neither. Syngenta nor EcoProduct could terminate the agreement, except for .cause upon a showing that the other party violated one or more , of the terms of the agreement. ....
The • Invitation to Bid for Contract, which EcoProduct sent to Cajun, states -in Section 1.0 that “[f]or purposes of this Invitation to Bid and all other document associated therewith, the word “owner” shall'be used interchangeably to describe EcoProduct Solutions and/or -its Agent, ENGlobal Engineering, Inc. and the word “Contractor” or “Subcontractor” shall be used to describe the bidder.” Cajun stated in its! bid proposal that the company was “pleased to submit the attached 117proposal to perform contract construction services on the EcoProducts Calcium Chloride Plant Project at the Syngenta, St. Gabriel, LA site.” The purchase orders issued by-EcoProduct to Cajun, state that the purchase orders were issued for the “Contract Construction- Services on the EcoProduct Solutions, LP Calcium Chloride Project at the Syngenta, St. Gabriel, LA manufacturing site.” Additionally, a Cajun billing invoice dated January 4,2006 lists EcoProduct as the owner...
In a sworn affidavit executed by Syn-genta plant manager Ralph Caddell on January 5, 2009, Mr. Caddell stated that the 2004 agreement between Syngenta and EcoProduct was a lease and that EcoPro-duct was deemed the owner of the CaCl2 facility at all. times.. Mr.. Caddell further stated that while Syngenta did contract to operate and maintain the CaCl2 facility, Syngenta did not share in any profits, losses, or risks associated with ownership of the CaCl2 facility. Mr. Caddell indicated that the CaCl2 facility was no longer operational and that Syngenta made demand upon EcoProduct to remove the CaCl2 facility from the Syngenta plant premises. Mr, Caddell noted that various other creditors had reclaimed parts of the former CaCl2 facility.
In its responses and objections to Syn-genta’s first requests for admissions and interrogatories, EcoProduct admitted that it never entered into a joint venture for the CaCl2 facility. Furthermore, EcoPro-duct.. admitted that it never agreed to share any profits or losses with Syngenta from the CaCl2 facility. . EcoProduct also admitted that Syngenta did not control nor did Syngenta select contractors for the CaCl2 facility.. Furthermore, Michael T. Largey — the project manager for the construction of the CaCl2 facility — testified in his deposition that since “EcoProducts’ capital funds ... were being expended” for the construction of the CaCI2 facility, he “assum[ed] EcoProducts was represented as owner.”
|1RIn. his- deposition, W. Yandell Rogers, III — the sole manager and member of Ec-oProduct Solutions GP, L.L.C. and manager during the construction of the CaC12 facility — responded affirmatively that Eco-Product was owner of the CaCl2 facility. Mr. Rogers further stated that EcoPro-duct had control over the bid process, contractor selection, and supervision of the work site. .
Cajun representative Thomas Hutchinson acknowledged in his deposition taken *161 on October 10, 2008, that the EcoProduct CaCl2 facility was located “on Syngenta property.” Mr. Hutchinson admitted that he had “limited knowledge”.of any profit-sharing . measures between Syngenta and EcoProduct, but he testified that as. to Syngenta’s ownership of the EcoProduct CaCl2 facility, it was his “understanding that EcoProduct would own it, but Syn-genta would operate it.” Mr. Hutchinson responded affirmatively that Cajun understood that the CaCl2 facility was an Eco-Product project at the Syngenta plant site. However, in a sworn affidavit executed by Mr. Hutchinson on March 25, 2014 (six years after his deposition), Mr. Hutchinson stated he had no “direct or specific knowledge of any separate ownership arrangement between Syngenta and EcoProduct” regarding the CaCl2 facility. He stated that “Cajun was subcontracted by EcoPro-duct ... to perform certain portions of the work related to construction” of the CaCl2 facility and that “Cajun - was aware that EcoProduct had contracted with Syngenta to build” the CaCl2 facility.[12]
On July 3, 2007, Syngenta sent written correspondence to EcoProduct formally noticing material breaches in the September 29, 2004 agreement. Syngenta also demanded defense and indemnification from suits and liens filed against Syngenta property by Cajun and another contractor, MMR Constructors, Inc. and demanded reimbursement for defense costs. Syn-genta followed up with a. 11flIetter dated October 16, 2007, terminating the lease for EcoProduct’s failure to cure material breaches of the agreement. Syngenta, also formally demanded that EcoProduct remove the CaCl2 facility from its premises. When EcoProduct failed to remove the CaCl2 facility from the Syngenta plant, Syngenta formally noticed EcoProduct that it was assuming ownership of the CaCl2 facility via written correspondence dated April 3,2008. ;
The privilege granted to subcontractors against owners in La. 'R.S. 9:4802 is limited to: (1) the owner(s) who have contracted with the contractor, or (2) to the owner(s) who have agreed in writing to the price and work -of the contract of a lessee and specifically agreed to be liable for any claims granted by La. R.S. 9:4802. La. R.S. 9;4806(B). Based on our de novo review of the evidence presented, -it is clear that Syngenta did not contract with Cajun. Although Syngenta was a lessor, it did not agree in writing to the price and work of Cajun’s contract with EcoProduct, nor did Syngenta specifically agree to be liable for any claims granted by the provisions of La. R.S. 9:4802. The evidence demonstrates that EcoProduct was the owner of the CaCl2 facility, ■ and Cajun contracted with EcoProduct.
We further hold that the fact that the September 24,2009 agreement was not recorded in this instance does not override the provisions of the LPWA, -in determining whether Cajun thus has a privilege against Syngenta. The public records doctrine does not alter the application of the statutory definitions of “owner” and “contractor” found in the LPWA. The fact that the agreement between Syngenta and EcoProduct was not filed in the public records does not make Syngenta liable to Cajun under the LPWA in this instance.
The ■ Louisiana public records doctrine generally expresses a public policy that interest in real estate must be *162 recorded in order to affect third persons. Simply put, an instrument in writing affecting immovable property which is not recorded is | annull and void except between the parties. Cimarex Energy Co. v. Mauboules, 2009-1170 (La.4/9/10), 40 So.3d 931, 943. The public records doctrine is generally set forth in La. C.C. art. 3338, which provides:
The rights and obligations established or created by the following written instruments are without effect as to a third person unless the instrument is registered by recording it in the appropriate mortgage or conveyance records pursuant to the provisions of this Title:
(1) An instrument that transfers an immovable or establishes a real right in or over an immovable.
(2) The lease of an immovable.
(3) An option or right of first refusal, or a contract to buy, sell, or lease an immovable or to establish a real right in or over an immovable.
(4) An instrument that modifies, terminates, or transfers the rights created or evidenced by the instruments described in Subparagraphs (1) through (3) of this Article. (Emphasis added.)
In this case, Syngenta and EcoProduct executed a lease of five acres of immovable property located at the Syngenta plant. The September 29; 2004 agreement established the rights and obligations between Syngenta and EcoProduct. Because the agreement was not recorded, it is without effect as to third parties, ie., Cajun. We note, however, that the agreement did not contemplate any rights or effect as to third parties. To hold Syngenta liable for Eco-Product’s failure to perform its obligations under the agreement and its failure to pay its contractors would undermine the statutory provisions of the LPWA. Although Cajun’s search of the Iberville Parish property records listed Syngenta as the record owner of the land upon which the EcoProduct CaCl2 facility was built, there is simply no evidence that Syngenta “contracted with the contractor” as required by La. R.S. 9:4806(B).
Also, at the time the lease was executed, the CaCl2 facility had not yet been built. Section 2.6 of the agreement required Eco-Product to record its leasehold interest after it prepared a metes and bounds survey of its leasehold interest(s), |2)easement(s), and right(s) of way, following the completion of Phase II of the agreement, ie., the start-up of the CaCl2 facility. Although Syngenta acknowledged that the agreement did enter into Phase III, Syngenta ultimately terminated the agreement based on EcoProduct’s material breaches of the agreement, including, but not limited to, EcoProduct’s failure to meet its benchmarks pursuant to Phases I, II, and III of the agreement, and the fact that the CaCl2 facility never became fully operational and commercial.
Cajun has failed to produce factual evidence sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial. See La. C.C.P. art. 966(C)(2). Thus, there is no genuine issue of material fact that Syngenta was not the owner of the EcoProduct CaCl2 facility, and Syngenta is entitled to summary judgment as a matter of law. Cajun is not entitled to attorneys’ fees pursuant to La. R.S. 9:4822(L)(2). We therefore affirm the April 17, 2014 judgment of the trial court, granting summary judgment in favor of Syngenta and dismissing the remaining claims of Cajun with prejudice. We likewise affirm the trial court’s February 11, 2014 judgment, denying Cajun’s motion for partial summary judgment on its LPWA claim against Syngenta.[13]

*163
DECREE

Based on the foregoing, the April 17, 2014 judgment of the trial court is hereby affirmed. The February 11, 2014 judgment of the trial court is also affirmed. All costs of this appeal are assessed to the plaintiff/appellant, Cajun Constructors, Inc.
AFFIRMED.

. See Cajun Constructors, Inc. v. EcoProduct Solutions, LP, No. CIV.A. 10-769-JJB, 2013 WL 64757, at *1 (M.D.La. Jan. 4, 2013). We also note that EcoProduct Solutions, GP, L.L.C. and EcoProduct, LP are Texas companies authorized to do'business in Louisiana that we refer to collectively as "EcoProduct.!’ EcoProduct is in the business of constructing and operating plants' that convert chemical waste into usable substances.

. See Exhibit M, affidavit of Kara Kearney.

. Made defendants in Cajun's petition were: EcoProduct Solutions, LP and EcoProduct Solutions, GP, L.U.C.; Rick Billings; Mike Largey; Priest River, Ltd., Yandell Rogers, Jr., and Yandell Rogers, III (the Rogers parties); Joe Swingle; Matt Whitaker; Jim Hughes; and Syngenta Crop Protection, Inc.

. Additionally, Cajun named as defendants in its first supplemental, amended and restated petition to enforce lien and for damages: Lewiston Holdings, Ltd. and Lewiston Atlas, Ltd.

. See La. R.S. 9:2781.

. See United States Bankruptcy Court for the Southern District of Texas, Houston Division, Case No. 10-366-02. Thereafter, 'David J. Askanase was appointed and qualified as trustee of the bankruptcy estate and case of Eco-Product. By order dated May 7, 2012, David J. Askanase substituted in the place and stead of EcoProduct.

. See Cajun Constructors, Inc. v. EcoProduct Solutions, LP, No. CIV.A. 10-769-JJB, 2013 WL 64757, at *1 (M.D.La. Jan. 4, 2013).

. See Cajun Constructors, Inc. v. EcoProduct Solutions, LP, No. CIV.A. 10-769-JJB, 2013 WL-64757, at *1 (M.D.La. Jan. 4, 2013).

. We note that answers were filed by some, but not all of the defendants, to Cajun’s original, first, and second supplemental, amended; and restated petitions.

.. See Gasaway-Gasaway-Bankston v. CP Land, L.L.C., 2014-1749 (La.App. 1 Cir. 6/5/15), 2015 WL 3548099, at *2 (unpublished).

. Pursuant to La, R.S, 9:4802(C), an owner is relieved of the claims against him and the .privileges securing them when the claims arise from the performance of a contract by a general contractor for whom a .bond is given and maintained as required by R.S. 9:4812 and when notice of the contract with the bond attached is properly and timely filed as required by R.S. 9:4811.

. 12 In Syngenta’s reply; to Cajun’s opposition to its motion for summary judgment, Syngenta moved to strike the affidavit of Tommy Hutchinson as his affidavit contradicted his prior deposition testimony. There is no indication of the trial court's ruling on the motion to strike contained in the record. •

. 13 We pretermit discussion of whether Cajun properly itemized its lien. Sge La. R.S. 9:4822(G). Additionally, we pretermit discussion of the various cases cited by the parties. A study of that jurisprudence will readily dis- - ■ close that those cases are based on dissimilar factual backgrounds;’ therefore, an analysis of • the reasoning and result in each decision would only lengthen this opinion without serving any useful purpose. See Fruge v. Muf-foletto, 242 La. 569, 584, 137 So.2d‘ 336, 341 (1962).